JOHN J. SHAEFFER (SBN 138331)
jshaeffer@foxrothschild.com
Meeghan H. Tirtasaputra (SBN 325572)
mtirtasaputra@foxrothschild.com
FOX ROTHSCHILD LLP
10250 Constellation Boulevard, Suite 900
Los Angeles, California 90067
Telephone:  310-598-4150
Facsimile:   310-556-9828

Attorneys for Plaintiff
STARQUEST VENTURES, INC.

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| STARQUEST VENTURES INC. dba Stelo, a California Corporation,<br><br>    Plaintiff,<br><br>  v.<br><br>DEXCOM, INC., a Delaware Corporation; and DOES 1-10, inclusive,<br><br>    Defendants. | Case No.:  2:25-cv-05470-AH-JPR<br>Hon. Anne Hwang<br><br>**STARQUEST VENTURES INC.'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION**<br><br>[*Filed concurrently with Notice of Motion and Motion; Declarations of Paul Rampel, Jessica Sheridan, Kimberly B. Gatling, and Meeghan H. Tirtasaputra; Compendium of Exhibits; Notice of Lodging; and [Proposed] Order*]<br><br>Date:   July 30, 2025<br>Time:   1:30 pm<br>Place:   Courtroom 7D<br><br>Action Filed:  June 16, 2025<br>Trial Date:  None Set |

# **TABLE OF CONTENTS**

**Page**

I.    Introduction ..................................................................................................... 1

II.   Background......................................................................................................... 2

    A.    Stelo.......................................................................................................... 2

    B.    Dexcom ................................................................................................... 4

    C.    Confusion in the Marketplace ..................................................... 6

    D.    Effort to Mitigate Confusion...................................................... 7

    E.    Irreparable Harm ............................................................................ 8

III.  Discussion........................................................................................................... 9

    A.    Standard of Proof ............................................................................ 9

    B.    Stelo will Likely Succeed on the Merits of its Trademark Claims..... 10

        1.    Breadth of Trademark Protection ............................................. 10

        2.    Likelihood of Confusion............................................................. 12

            a)    Similarity of the Marks ................................................. 14

            b)    The Strength of the Mark ............................................. 15

            c)    Relatedness of the Goods and Marketing Channels Used

                  ............................................................................................ 16

            d)    Dexcom's Intent .............................................................. 18

            e)    Actual Confusion............................................................. 19

            f)    Likelihood of Expansion ............................................... 20

            g)    The Consumer's Degree of Care.................................. 21

    C.    Irreparable Harm ......................................................................... 21

    D.    Balance of Equities ...................................................................... 23

    E.    Public Interest ............................................................................... 24

    F.    Bond .................................................................................................... 24

IV.   Conclusion...................................................................................................... 25

i

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*2Die4Kourt v. Hillair Capital Mgmt.*,
    692 F. App'x 366 (9th Cir. 2017).................................................................23, 25

*A & H Sportswear, Inc. v. Victoria's Secret Stores, Inc.*,
    237 F.3d 198 (3d Cir.2000) .................................................................. 15

*AK Futures LLC v. Boyd Street Distro, LLC*,
    35 F.4th 682 (9th 2022) ......................................................9, 21, 22

*Alliance for the Wild Rockies v. Cottrell*,
    632 F.3d 1127 (9th Cir. 2011).................................................................9, 24

*Americana Trading Inc. v. Russ Berrie & Co.*,
    966 F.2d 1284 (9th Cir. 1992).................................................................. 15

*Ameritech, Inc. v. Am. Info. Techs. Corp.*,
    811 F.2d 960 (6th Cir. 1987) .................................................................. 12

*AMF Inc. v. Sleekcraft Boats*,
    599 F.2d 341 (9th Cir. 1979).................................................................*passim*

*Arc of Cal. v. Douglas*,
    757 F.3d 975 (9th Cir. 2014).................................................................. 23

*Barahona–Gomez v. Reno*,
    167 F.3d 1228 (9th Cir. 1999).................................................................. 24

*Blumenthal Distrib., Inc. v. Herman Miller, Inc.*,
    963 F.3d 859 (9th Cir. 2020) .................................................................. 13

*Brookfield Commc'ns, Inc. v. W. Coast Ent. Corp.*,
    174 F.3d 1036 (9th Cir. 1999).................................................................. 18

*Cadence Design Sys. v. Avant! Corp.*,
    125 F.3d 824 (9th Cir. 1997).................................................................. 23

*Carter-Wallace, Inc. v. Procter & Gamble Co.*,
    434 F.2d 794 (9th 1970) .................................................................. 17

*Century 21 Real Estate Corp. v. Sandlin*,
    846 F.2d 1175 (9th Cir. 1988).................................................................9, 16

*Checkpoint Sys., Inc. v. Check Point Software Techs., Inc.*,
    269 F.3d 270 (3rd 2001) .................................................................. 19

*Cleary v. News Corp*,
    30 F.3d 1255 (9th Cir. 1994).................................................................. 10

ii

*Coach Servs., Inc. v. Triumph Learning LLC*,
    668 F.3d 1356 (Fed. Cir. 2012) ................................................................. 11

*Commerce Nat'l Ins. Servs., Inc. v. Commerce Ins. Agency, Inc.*,
    214 F.3d 432 (3d Cir. 2000) ...................................................................... 12

*Conn. Gen. Life Ins. Co. v. New Images of Beverly Hills*,
    321 F.3d 878 (9th Cir. 2003) ..................................................................... 25

*Credit One Corp. v. Credit One Fin., Inc.*,
    661 F.Supp.2d 1134 (C.D. Cal. 2009) ........................................................ 19

*Daddy's Junky Music Stores, Inc. v. Big Daddy's Fam. Music Ctr.*,
    109 F.3d 275 (6th Cir. 1997) ..................................................................... 13

*Delta Forensic Engineering, Inc. v. Delta V Biomechanics, Inc.*,
    402 F.Supp.3d 902 (C.D. Cal. 2019) ......................................................... 20

*Dreamwerks Prod. Grp., Inc. v. SKG Studio*,
    142 F.3d 1127 (9th Cir. 1998) ............................................................*passim*

*Eclipse Assoc. Ltd. v. Data Gen. Corp.*,
    894 F.2d 1114 (9th Cir.1990) ..................................................................... 14

*Entrepreneur Media, Inc. v. Smith*,
    279 F.3d 1135 (9th Cir. 2002) ................................................................... 13

*Fortune Dynamic, Inc. v. Victoria's Secret Stores Brand Mgmt., Inc.*,
    618 F.3d 1025 (9th Cir. 2010) ................................................................... 14

*Garcia v. Google, Inc.*,
    786 F.3d 733 (9th Cir. 2015) ....................................................................... 9

*Gianni Versace, S.p.A., v. Versace 19.69 Abbigliamento Sportivo SRL*,
    328 F.Supp.3d 1007 (N.D. Cal. 2018) ....................................................... 22

*Gonzales v. O Centro Espirita Beneficente Uniao
    do Vegetal*, 546 U.S. 418 (2006) ............................................................... 10

*Good Meat Project v. GOOD Meat, Inc.*,
    716 F.Supp.3d 783 (N.D. Cal. 2024) .................................................... 15, 16

*GoTo.com, Inc. v. Walt Disney Co.*,
    202 F.3d 1199 (9th Cir. 2000) ................................................................. 9, 25

*Groupion, LLC v. Groupon, Inc.*,
    859 F.Supp.2d 1067 (N.D. Cal. 2012) ....................................................... 17

*Grubhub Inc. v. Relish Labs LLC*,
    80 F.4th 835 (7th Cir. 2023) ...................................................................... 15

*Grupo Gigante SA De CV v. Dallo & Co., Inc.*
    391 F.3d 1088 (9th Cir. 2004) ................................................................... 10

STARQUEST'S MEMO. OF P&AS IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION

*Ironhawk Techs., Inc. v. Dropbox, Inc.,*
    2 F.4th 1150 (9th Cir. 2021) .................................................................... *passim*

*JL Beverages Co., LLC v. Jim Beam Brands Co.,*
    828 F.3d 1098 (9th Cir. 2016) ............................................................... 18

*Jorgensen v. Cassiday,*
    320 F.3d 906 (9th Cir. 2003) ................................................................ 24

*Kiva Health Brands LLC v. Kiva Brands Inc.,*
    402 F.Supp.3d 877 (N.D. Cal. 2019) ........................................... 9, 10, 23

*Las Vegas Sands Corp. v. Fan Yu Ming,*
    360 F.Supp.3d 1072 (D. Nev. 2019) ..................................................... 24

*Lashify, Inc. v. Urban Dollz LLC,*
    CV 22-6148-GW-AFMx, 2022 WL 18281527 (C.D. Cal. Dec. 14,
    2022) .................................................................................................... 23

*Lerner & Rowe PC v. Brown Engstrand & Shely LLC,*
    119 F.4th 711 (9th Cir. 2024) ............................................................... 20

*Lodestar Anstalt v. Bacardi & Co. Limited,*
    31 F.4th 1228 (9th Cir. 2022) ......................................................... 15, 16

*Lydo Enters., Inc. v. City of Las Vegas,*
    745 F.2d 1211 (9th Cir. 1984) .............................................................. 23

*Marketquest Grp., Inc. v. BIC Corp.,*
    862 F.3d 927 (9th Cir. 2017) ................................................................ 19

*McLeod v. Hosmer-Dorrance, Inc.,*
    76-1601, 1976 WL 21104 (N.D. Cal. 1976) ..................................... 11, 24

*Network Automation, Inc. v. Advanced Systems Concepts, Inc.,*
    638 F.3d 1137 (9th Cir. 2011) .......................................................... 2, 10

*Oakland Tribune, Inc. v. Chronicle Pub. Co.,*
    762 F.2d 1374 (9th Cir. 1985) .............................................................. 22

*Perfect 10, Inc. v. Amazon.com, Inc.,*
    508 F.3d 1146 (9th Cir. 2007) .............................................................. 10

*Playboy Enters., Inc. v. Netscape Comms. Corp.,*
    354 F.3d 1020 (9th Cir.2004) ............................................................... 13

*Rearden LLC v. Rearden Commerce, Inc.,*
    683 F.3d 1190 (9th Cir. 2012) ......................................................... 10, 13

*Republic of the Philippines v. Marcos,*
    862 F.2d 1355 (9th Cir. 1988) ................................................................ 9

*San Diego Comic Convention v. Dan Farr Prods.,*
    336 F.Supp.3d 1191 (S.D. Cal. 2018) .................................................. 22

iv

*Standard Brands, Inc. v. Smidler*,
  151 F.2d 34 (2d Cir. 1945) ................................................................ 17

*State of Idaho Potato Comm'n v. G & T Terminal Packaging, Inc.*,
  425 F.3d 708 (9th Cir. 2005) ............................................................ 24

*Stone Creek, Inc. v. Omnia Italian Design, Inc.*,
  875 F.3d 426 (9th Cir. 2017) ................................................ 10, 11, 19

*Syntex Labs., Inc. v. Norwich Pharmacal Co.*,
  437 F.2d 566 (2d Cir. 1971) ............................................................ 11

*Thane Int'l, Inc. v. Trek Bicycle Corp.*,
  305 F.3d 894 (9th Cir.2002) ............................................................ 13

*Theorem, Inc. v. Citrusbyte, LLC*, CV 21-4660-GW-AGRx, 2021 WL
  5750238 (C.D.Cal. Nov. 16, /2011)) ........................................ 17, 18, 19, 20

*Tiger Lily Ventures Ltd. v. Barclays Capital Inc.*,
  35 F.4th 1352 (Fed. Cir. 2022) ................................................ 11, 17

*Triad Sys. Corp. v. Se. Express Co.*,
  64 F.3d 1330 (9th Cir. 1995) ............................................................ 24

*Univ. of Texas v. Camenisch*,
  451 U.S. 390 (1981) ........................................................................ 10

*Winter v. Natural Resources Defense Council, Inc.*,
  555 U.S. 7 (2008) ............................................................................ 23

**Statutes**

5 U.S.C. §§ 1051 *et seq.* ...................................................................... 1, 21

15 U.S.C. § 1116(a) ............................................................................ 9, 21

Trademark Dilution Revision Act of 2006, Pub. L. No. 109-312, 120
  Stat. 1730–33 ................................................................................ 13

**Court Rules**

Fed. R. Civ. P. 65(c) .......................................................................... 24

**Other Authorities**

McCarthy, Trademarks and Unfair Competition, (5th ed 2025).................... *passim*

## I.    **INTRODUCTION**

Since its launch in August 2024, more than 3,000 customers of the Stelo-branded continuous glucose monitor (the "Stelo Monitor") sold and marketed by Defendant Dexcom, Inc. ("Dexcom") have mistakenly sought support from Plaintiff Stelo ("Stelo"), a San Francisco based software company incorporated as StarQuest Ventures, Inc. ("StarQuest"), believing that Stelo is affiliated with Dexcom. Messages left include those seeking help with potentially serious health conditions like having a needle stuck in a user's arm and problems with the monitor's software application.

Stelo is the senior user. Since September 2023, Stelo has held a federal registration in its name in the software class.  Dexcom knew of Stelo's registration and use before launching its Stelo Monitor.  Even though the examiner of Dexcom's federal trademark application issued an Office Action finding a likelihood of confusion with Stelo's registration, Dexcom launched the Stelo Monitor anyway.

While customers seeking Stelo's data connectivity, replication, and integration software are not likely to purchase a Stelo Monitor by mistake, the confused customers of the Stelo Monitor overwhelmingly demonstrate market identification of Stelo with the Stelo Monitor and confuse Stelo as a Dexcom affiliate. This loss of independent source identification renders Stelo beholden to the Stelo Monitor's reputation, a public reputation that can quickly turn as it did for the makers of Boar's Head meats and cheeses and Tesla cars.

This case is a paradigm of reverse post-sale confusion where Goliath trusts it can quickly overwhelm a much smaller rights holder. Such reverse confusion is actionable under the Lanham Act as well as California statutory and common law trademark protection. Each scheme militates against likely consumer confusion, a focus heightened when the confusion relates to a health care product. While courts consider several factors to determine a likelihood of pre-trial confusion, there is no greater indicia of likely future consumer confusion than the existence of substantial

existing consumer confusion. Simply, the *Sleekcraft* factors stand in as a proxy in the absence of direct evidence of confusion, which is overwhelmingly present here. *Network Automation, Inc. v. Advanced Systems Concepts, Inc*., 638 F.3d 1137, 1145 (9th Cir. 2011) ("The *Sleekcraft* factors are intended as an adaptable proxy for consumer confusion, not a rote checklist.")

Unless Dexcom is preliminarily enjoined from using "Stelo" to refer to its monitor, unprecedented confusion will continue that is both irreparably decimating Stelo's goodwill and interfering with Dexcom's own customers' ability to obtaining support for their medical device. Since Dexcom's infringement is at least reckless, if not intentional, a nominal bond is appropriate, at most. Simply, Stelo is likely to prevail, Dexcom cannot overcome Stelo's presumed irreparable harm, and both the balance of equities and public interest tip in favor of a preliminary injunction.

## II.    **BACKGROUND**

### A.    **Stelo**

Stelo is a small, privately held company headquartered in San Francisco that, for the past 30 years, has provided purpose data integration software solutions across the economy, including to the healthcare and pharmaceutical industry.[1]  Stelo refers to its ability to integrate systems as creating a "Stelo Ecosystem." *Id.*at ¶ 3.  To date, Stelo's business has been enterprise focused and is marketed directly to IT professionals across all industries. *Id.* Stelo's marketing strategy focuses on strengthening both organic and paid channels (e.g., Google Ads, Bing) to drive measurable growth in website traffic, leads, and brand awareness. *Id.* The key areas of focus are organic search rankings, improving user engagement with search console queries, and expanding paid campaigns with refined target audiences.  *Id.*

Stelo's software is available for purchase as a B2B offering via direct sale and through reseller partnerships and Microsoft's Azure Marketplace. Stelo is actively

---

[1] Accompanying Declaration of Paul Rampel ("Rampel Decl.") ¶ 2.

**STARQUEST'S MEMO. OF P&AS IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION**

working on offerings in the Google Cloud Marketplace and Amazon with a release date in the second half of 2025. Rampel Decl. ¶ 2.

Due to the nature of its product offering, being always available is mission critical to its customers. *Id.* at ¶ 7. For this reason, Stelo has always maintained a robust support system to quickly respond to client needs and to promptly address any system outages. *Id.* While support is critical, prior to the launch of the Stelo Monitor, Stelo would receive about a dozen support calls a month.[2]

Stelo intends to broaden its reach to include selling on online marketplaces like Amazon and to deploy consumer-focused products, including applications for smartphones that can be downloaded from the Apple or Android app stores. Rampel Decl. ¶ 4. Stelo's current annual revenues are about $4 million, and it expends approximately 18% of annual revenue on marketing and advertising. *Id.* at ¶ 2.

In 2021, Stelo concluded that its StarQuest name had lost its distinctiveness due to the plethora of other companies and products with similar names.[3] As such, StarQuest partnered with a marketing firm to create a new brand, conducting an extensive brand and replication market analysis in doing so. *Id.* StarQuest started doing business as Stelo by October of 2022, notifying its customers and the public of the change. Rampel Decl. ¶9; Exs. 21-23. The name was chosen as a bridge between Stelo's previous "star" iconography and the term "stem" to mirror Stelo's messaging around data ecosystems, the Stelo Ecosystem. Rampel Decl. ¶ 8.

In January 2022, Stelo filed an intent to use application with the United States Patent and Trademark Office ("USPTO") seeking registration of the Stelo mark in International Class 009 for computer software, namely downloadable computer software in the field of data replication and software maintenance instillation. Ex. 2

---

[2] Accompanying Declaration of Jessica Sheridan ("Sheridan Decl.") at ¶ 7.

[3] *See* Rampel Decl. ¶ 8, and Stelo Rebranding Presentation, a copy of which is attached to the accompany Compendium of Exhibits as Exhibit 20. All subsequent references to "Ex." refer to documents attached to the Compendium authenticated in the accompanying declarations.

STARQUEST'S MEMO. OF P&AS IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION

1    at 68.  Stelo received a notice of allowance from the USPTO on January 24, 2023.

2    Ex. 2 at 52.  Registration of the Stelo mark was received on September 12, 2023,

3    without any limitation on font, style, size, or color and given registration number

4    7,165,605 ("the '605 Registration"). *Id.* at 11. Concomitant with its pursuit of this

5    federal registration, Stelo obtained similar foreign registrations.[4]

6          Since its adoption, Stelo has used that name exclusively to refer to its business

7    and its products.  Rampel Decl. ¶ 9.  Prior to Dexcom's launch of the Stelo Monitor,

8    Stelo considered its rebranding effort a success.  *Id.* Stelo had transferred the

9    goodwill developed in the StarQuest name to Stelo and believed the more distinctive

10   name Stelo name had only enhanced its reputation and goodwill.  *Id*.  On its website

11   and in marketing, Stelo may dress its mark as follows:

12       **B.**   **Dexcom**

13         Dexcom has enjoyed meteoric growth, with revenues increasing from $250

14   million in 2014 to more than $4 billion in 2024. Ex. 3 at 78.  In 2024, Dexcom spent

15   nearly $300 million on marketing.  *Id.* at 224. Prior to launching the Stelo Monitor,

16   Dexcom's primary business line was continuous glucose monitoring systems for

17   diabetic patients by prescription.  *Id.* at 86-87. Dexcom distinguished itself in the

18   market with its software solutions that allowed continuous glucose reading to be

19   clearly relayed to patients over their smart phones or other devices.  *Id.* at 79.

20   Dexcom's current prescription-based offerings are branded as the G6, launched in

21   2018, and the G7, launched in 2022. *Id.* at 86-87.

22         In December of 2023, Dexcom filed for premarketing approval with the Food

23   and Drug Administration ("FDA") for a first of its kind over-the-counter continuous

24   glucose monitor for prediabetic patients based on the system's substantial

25   equivalence to its existing G7 prescription-based system.  Dexcom received that

26   approval in March of 2024.  Ex. 4. at 236; Ex. 5.

27

28   [4] *See* accompanying declaration of Kim Gatling ("Gatling Decl.") at ¶ 5.

1    Even before it sought approval from the FDA, Dexcom had already decided to

2    brand its over-the-counter product as Stelo, filing a trademark application with the

3    USPTO in both the software and medical device classes on November 16, 2023, more

4    than a month after the USPTO issued Stelo its '605 Registration.  Ex. 6 at 393.  On

5    July 2, 2024, the examiner issued an Office Action finding that a likelihood of

6    confusion existed with respect to its application in the software class and Stelo's '605

7    Registration.[5]  Ex. 5 at 246. Despite this finding, Dexcom went forward and launched

8    its Stelo Monitor anyway.  In an acknowledgment of the potential confusion with the

9    senior user, Dexcom refers to its Stelo

10   Monitor on its website and in advertising as

11   Stelo by Dexcom. Exs. 8 -10.

 

12       With respect to its ownership of the "Stelo" mark, Dexcom says in its terms of

13   use "'Stelo' is a trademark that belongs to us."  Ex. 24 at 687.



18   On December 31, 2024, and after receiving a three-month extension, Dexcom

19   responded to the Office Action letter challenging the examiner's conclusions.  Ex. 6

20   at 337. The examiner has yet to answer Dexcom's response.  Ex. 6.

21       As one might expect from the first product in a new product category, the Stelo

22   Monitor garnered significant media attention, including being named a leading

23   technological innovation for 2024 by Time Magazine.  Exs. 11-14.  This attention

24   can be seen from the fact that one would need to traverse 9 pages of a Google search

25   for "Stelo" before getting to any reference to the senior user of the mark.  Ex. 15.

---

[5] Stelo did not file an opposition to Dexcom's registration in advance of the filing of this lawsuit because the USPTO had not published Dexcom's intent to register this mark prior to its launch of the Stelo Monitor.

STARQUEST'S MEMO. OF P&AS IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION

1  Curiously, however, Dexcom has not separately published any data on sales or

2  revenues derived from such sales of its Stelo Monitor.  Exs. 3, 16, 17.

3      **C.     Confusion in the Marketplace**

4      In June 2024, prior to the launch of the Stelo Monitor, Stelo's customer support

5  phone line received a total of 10 calls. Sheridan Decl. ¶ 7. By September, this amount

6  ballooned to more than 300,

7  almost all of which were meant for

8  Dexcom and concerned the Stelo

9  Monitor. Such inquiries are not

10  limited to its support line but also

11  are received by its sales line, call

12  center, and by other means. Exs.

13  18, 19; Sheridan Decl, ¶¶ 8-9.



14      As a result of this inundation, Stelo modified its call center protocols to ask

15  right at the outset whether the call relates to Stelo's software offerings or a continuous

16  glucose monitoring.  Sheridan Decl. ¶ 8.  Despite the prompt, customers persist,

17  arguing that Stelo is an affiliate of Dexcom's or that Dexcom directed the customer

18  to call this number.  *Id.*  Stelo retains all 3,000 plus voice and text inquiries received

19  and are lodging, to protect privacy, hundreds of examples with the Court on an

20  excepted USB.  *Id.*  A few examples of these confused inquires, which have been

21  redacted to preserve patient confidentiality, are below:

22  • 3/26/2025 msg 1419 – "I purchased [your] … glucose sensor in
       October of 2024….[My wife] started using it and after using it for
23     about 8 days or so the sensor came apart.  It came out of the arm that
       my wife was using it for.  I think it broke off and, I think where there
24     is a needle or whatever is still embedded in the, inside her.  I was
       wondering what we need to do and what the procedure is ….."

25
26  • 3/14/2025 msg. 838 – "I am calling for support with the Stelo CDM
       monitor.  I inserted a new monitor and have tried to troubleshoot
27     myself but it will not connect.  The app will not connect to the
       sensor, and I have more details to give over the phone once a human
28     can reach me and talk to me about it."

**STARQUEST'S MEMO. OF P&AS IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION**

- 3/24/2025 msg. 1230 – "I'm calling about a sensor that's connected and then disconnected within 24 hours. I did try to get help on the AI bot, but it was not successful, and I do need a replacement sensor sent as soon as possible because I do not have another sensor and I'm about to run out in a couple of days and I'm also travelling. So, if you could please give me a call back today."

- 3/25/2025 msg. 1426 – "Hey this is already frustrating that nobody answers the phone. We need to know if you have a – if you use a receiver with yours because the cell phone is not going to work…. Since you're a division of Dexcom I don't see why you don't answer the phone and we have to leave a message."

- 3/28/2025 msg. 1232 – "Good afternoon, I was directed to this number by Dexcom Technical Support. I am needing help with a Stelo device."

- 4/2/2025 msg. 1214 – "I'm actually calling regarding my Dexcom Stelo order. This was the number I was given by Dexcom themselves. Supposedly -- I've seen my credit card was charged on March 23rd, which now we're pushing 2 weeks and I've still not received my sensors."

- 4/15/2025 msg. 1313 – "I have a Stelo, just a brand new one that I tried to put on yesterday, something was wrong with it. The needle apparently grabbed the senor wire so instead of inserting it into my arm, it actually pulled out of the back of the Stelo, and customer service from Dexcom gave me your number so I'm calling you to see what we can do about getting that replaced."

- 4/30/2025 msg. 0519 – "I put on a new sensor this morning and during warm up it stopped and said "replace sensor." Number one, I don't have a replacement sensor, they are supposed to be shipped and I haven't received them yet. Number two, when I filled out the form with Stelo but it did not ask me for the serial number, so I need somebody to give me a call back."

Sheridan Dec. ¶ 10.

### D.    Effort to Mitigate Confusion

In March of 2024, Stelo learned that Dexcom had filed an application in the EU to register the "Stelo" mark for software, and Stelo thereafter filed an opposition. . Gatling Decl. ¶ 6. In June of 2024, Stelo's European counsel received a settlement proposal from Dexcom that they discussed through August of 2024. *Id.* ¶ 7 In August 2024, Dexcom's United States counsel reached out to Dexcom's counsel to further discuss a global settlement and the two discussed a possible coexistence relationship. *Id.* In October of 2024, Stelo informed Dexcom of the large number of calls Stelo

7

had received from confused customers of the Stelo Monitor and thereafter forwarded examples to Dexcom. *Id.* ¶ 8. By April 2025, Stelo relayed to Dexcom that it questioned whether coexistence was possible, and Dexcom then requested more examples of customer confusion. *Id.* ¶ 9. Stelo would eventually provide Dexcom hundreds of examples of confused customers. *Id.* While Dexcom, through its counsel, expressed a willingness to speak further, it suggested that since each operated in distinct markets and to distinct customers, there was no likelihood of confusion within the meaning of trademark law. *Id.* ¶ 10. With respect to the calls received by Stelo relating to the Stelo Monitor, Dexcom stated that such confusion was not actionable. *Id.* When the filing of this lawsuit failed to spawn further meaningful discussions, Stelo decided to bring the instant motion.

## E.    <u>Irreparable Harm</u>

The reckless introduction of another "Stelo Ecosystem" by Dexcom has created widespread confusion in the market. Rampel Decl. ¶ 13. The Dexcom version of Stelo is associated with subpar support, product defects, and diminished value— perceptions that are damaging the reputation of Stelo's brand. *Id.* ¶ 14. The overlapping use of the Stelo name for similar products and services—particularly those involving mobile devices and cloud-based solutions—makes it difficult for customers, investors, and partners to distinguish between the two. *Id.* ¶ 15

This confusion is eroding the value and distinctiveness of the Stelo brand. *Id.* ¶ 16. Potential customers and investors are likely to disregard Stelo's brand due to negative associations with Dexcom's products. Stelo's ability to attract and retain key employees is also at risk as the company struggles to differentiate itself and its offerings from Dexcom and its offerings. *Id.* ¶¶ 17-18. The resulting loss of goodwill, customer trust, and market position cannot be remedied by monetary damages alone. *Id.* ¶ 19. Absent an injunction, Stelo will be compelled to change its name again to preserve the identification of its offerings with a single source. *Id.* ¶ 21.

STARQUEST'S MEMO. OF P&AS IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION

## III.    DISCUSSION

### A.    Standard of Proof

"Injunctive relief is the remedy of choice for trademark and unfair competition cases, since there is no adequate remedy at law for the injury caused by a defendant's continuing infringement." *Century 21 Real Estate Corp. v. Sandlin*, 846 F.2d 1175, 1180 (9th Cir. 1988); 15 U.S.C. § 1116(a).  Upon a sufficient showing, a preliminary injunction is appropriate when "the court perceives a need to preserve the status quo." *Republic of the Philippines v. Marcos*, 862 F.2d 1355, 1362 (9th Cir. 1988).  The status quo does not refer to the status before the lawsuit began, but to "the last, uncontested status which preceded the pending controversy." *Garcia v. Google, Inc*., 786 F.3d 733, 740 n.4 (9th Cir. 2015). In the trademark context, this means the status that existed "before [the alleged infringer] began using its allegedly infringing [mark]." *GoTo.com, Inc. v. Walt Disney Co*., 202 F.3d 1199, 1210 (9th Cir. 2000).

"To obtain a preliminary injunction, a party must show: (1) it will likely succeed on the merits, (2) it will likely suffer irreparable harm in the absence of preliminary relief, (3) the balance of the equities tips in its favor, and (4) the public interest favors an injunction." *AK Futures LLC v. Boyd Street Distro*, *LLC*, 35 F.4th 682, 688 (9th 2022).  "The Ninth Circuit has adopted a 'sliding scale approach,' such that '"serious questions going to the merits" and a balance of hardships that tips sharply towards the plaintiff can support issuance of a preliminary injunction, so long as the plaintiff also shows that there is a likelihood of irreparable injury and that the injunction is in the public interest.'" *Kiva Health Brands LLC v. Kiva Brands Inc*., 402 F.Supp.3d 877, 883 (N.D. Cal. 2019) (quoting *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1134–35 (9th Cir. 2011). "For the purposes of injunctive relief, 'serious questions' refers to questions which cannot be resolved one way or the other at the hearing on the injunction and as to which the court perceives a need to preserve the status quo lest one side prevent resolution of the questions or execution of any judgment by altering the status quo." *Marcos,* 862 F.2d at 1362.

"[T]he burdens at the preliminary injunction stage track the burdens at trial." *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 429 (2006). Thus, "once the moving party has carried its burden of showing a likelihood of success on the merits, the burden shifts to the non-moving party to show a likelihood that its affirmative defense will succeed." *Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146, 1158 (9th Cir. 2007) (citing *Gonzales*, 546 U.S. at 429). However, "a preliminary injunction is customarily granted on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits." *Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (1981) ("A party thus is not required to prove his case in full at a preliminary injunction hearing.").

## B.    Stelo will Likely Succeed on the Merits of its Trademark Claims

### 1.    Breadth of Trademark Protection

"To prevail on a claim of trademark infringement, a plaintiff must show (a) ownership of a valid mark and (b) use by defendant in commerce of a mark likely to cause consumer confusion."[6] *Kiva Health*, 402 F.Supp.3d at 883 (citing *Network Automation*, 638 F.3d at 1144). Since Stelo holds a valid registration in its "Stelo" mark, Stelo's likelihood of success turns on its ability to demonstrate a likelihood of confusion, "which asks whether a 'reasonably prudent' marketplace consumer is 'likely to be confused as to the origin of the good or service bearing one of the marks.'" *Stone Creek, Inc. v. Omnia Italian Design, Inc.*, 875 F.3d 426, 431 (9th Cir. 2017) (quoting *Rearden LLC v. Rearden Commerce, Inc.*, 683 F.3d 1190, 1214 (9th Cir. 2012) (citation omitted)). "Source confusion is not the boundary, for actionable confusion includes confusion as to affiliation, connection or sponsorship." McCarthy on Trademarks and Unfair Competition, § 23:5 (5th ed 2025) ("McCarthy");

---

[6] Since "[a]s a general matter, trademark claims under California law are 'substantially congruent' with federal claims and thus lend themselves to the same analysis," this memorandum will discuss only federal law. *Grupo Gigante SA De CV v. Dallo & Co., Inc*. 391 F.3d 1088, 1100 (9th Cir. 2004); *Cleary v. News Corp*, 30 F.3d 1255, 1262–63 (9th Cir. 1994)

10

1    *Dreamwerks Prod. Grp., Inc. v. SKG Studio*, 142 F.3d 1127, 1130 (9th Cir. 1998)

2    ("the question here is whether a reasonable consumer attending a Dreamwerks-

3    sponsored convention might do so believing that it is a convention sponsored by

4    DreamWorks"); *Tiger Lily Ventures Ltd. v. Barclays Capital Inc*., 35 F.4th 1352,

5    1362 (Fed. Cir. 2022) ("the relevant inquiry considers 'if the respective products are

6    related in some manner and/or if the circumstances surrounding their marketing are

7    such that they could give rise to the mistaken belief that they emanate from the same

8    source.'" (quoting *Coach Servs., Inc. v. Triumph Learning LLC*, 668 F.3d 1356, 1369

9    (Fed. Cir. 2012)).

10       Where, as here, the confusion "could result in physical harm to the consuming

11    public, whether through failure to receive effective medication" or the failure to

12    timely address problems with a medical device, "a stricter standard in order to prevent

13    likelihood of confusion seems desirable." *Syntex Labs., Inc. v. Norwich Pharmacal*

14    *Co*., 437 F.2d 566, 569 (2d Cir. 1971); *McLeod v. Hosmer-Dorrance, Inc.*, 76-1601,

15    1976 WL 21104 (N.D. Cal. 1976) ("The product in question here is a medical device

16    used in the care and treatment of serious injury; as such, there is even a greater public

17    interest in insuring that no confusion exists as to the source of plaintiff's and

18    defendant's products.").

19       In the classic context, a likelihood of confusion is judged by whether

20    consumers purchasing a junior user's product are likely to be confused that they are

21    purchasing a produced sourced or sponsored by the senior user of the mark.

22    McCarthy §23.5 ("The most common and widely recognized type of confusion that

23    creates infringement is purchaser confusion of source which occurs at the time of

24    purchase: point of sale confusion.")  Trademark law, however, has expanded to reach

25    consumer confusion outside the point of sale to include both initial interest and

26    consumer confusion after the sale or post-sale confusion.  *Id.*; *Stone Creek*, 875 F.3d

27    at 433 ("When we widen the lens to embrace the full scope of qualifying actual

28    confusion evidence, we credit the examples of customers seeking to purchase

11

furniture or having already purchased Bon-Ton furniture who misdirected their queries to Stone Creek.")

Additionally, trademark law reaches not only instances where a junior user attempts to trade on the good name of a senior user, it also reaches reverse confusion. "[R]everse confusion occurs when a person who knows only of the well-known junior user comes into contact with the lesser-known senior user, and because of the similarity of the marks, mistakenly thinks that the senior user is the same as or is affiliated with the junior user." *Ironhawk Techs., Inc. v. Dropbox, Inc.*, 2 F.4th 1150, 1160 (9th Cir. 2021) (reversing grant of summary judgment). "This can occur when 'the junior user's advertising and promotion so swamps the senior user's reputation in the market that customers are likely to be confused into thinking that the senior user's goods are those of the junior user[.]'" *Id.* (quoting 4 McCarthy on Trademarks and Unfair Competition § 23:10 (5th ed. 2020) (citations and footnotes omitted). Reverse confusion can effectively "place the senior company's goodwill in the hands of the junior user." *Id.* As a result, "'the senior user loses the value of the trademark— its product identity, corporate identity, control over its goodwill and reputation, and ability to move into new markets.'" *Id.* (quoting *Ameritech, Inc. v. Am. Info. Techs. Corp.*, 811 F.2d 960, 964 (6th Cir. 1987)); *see also Commerce Nat'l Ins. Servs., Inc. v. Commerce Ins. Agency, Inc.*, 214 F.3d 432, 445 (3d Cir. 2000) ("[T]he doctrine of reverse confusion is designed to prevent the calamitous situation [where] a larger, more powerful company usurp[s] the business identity of a smaller senior user."). "The question in such cases is whether consumers doing business with the senior user might mistakenly believe that they are dealing with the junior user." *Dreamwerks,* 142 F.3d at 1130.

## 2.    Likelihood of Confusion

Since direct evidence of consumer confusion can be difficult to come by, especially at the preliminary injunction stage, courts have developed surrogate measures to gauge the likelihood of confusion. *AMF Inc. v. Sleekcraft Boats*, 599 F.

12

2d 341, 352 (9th Cir. 1979) ("Evidence that use of the two marks has already led to confusion is persuasive proof that future confusion is likely," but "[p]roving actual confusion is difficult[.]").  Direct evidence of actual consumer confusion in the past, however, remains the best evidence of a likelihood of confusion in the future, and a sufficient showing of actual confusion alone proves a likelihood of confusion.  *Thane Int'l, Inc. v. Trek Bicycle Corp*., 305 F.3d 894, 902 (9th Cir.2002), superseded on other grounds by statute, Trademark Dilution Revision Act of 2006, Pub. L. No. 109-312, 120 Stat. 1730–33, as recognized in *Blumenthal Distrib., Inc. v. Herman Miller, Inc*., 963 F.3d 859, 870 (9th Cir. 2020) ("Evidence of actual confusion constitutes persuasive proof that future confusion is likely . . . If enough people have been actually confused, then a likelihood that people are confused is established."); *Rearden LLC v. Rearden Commerce, Inc*., 683 F.3d 1190, 1210, 103 U.S.P.Q.2d 1161 (9th Cir. 2012) ("[E]vidence of actual confusion, at least on the part of an appreciable portion of the actual consuming public, constitutes strong support for a 'likelihood of confusion' finding."); *Playboy Enters., Inc. v. Netscape Comms. Corp*., 354 F.3d 1020, 1026 (9th Cir.2004) ("a showing of actual confusion among significant numbers of consumers provides strong support for likelihood of confusion"); *Entrepreneur Media, Inc. v. Smith*, 279 F.3d 1135, 1150 (9th Cir. 2002) ("[e]vidence of actual confusion is strong evidence that future confusion is likely"); *Daddy's Junky Music Stores, Inc. v. Big Daddy's Fam. Music Ctr*., 109 F.3d 275, 284 (6th Cir. 1997) ("Evidence of actual confusion is undoubtedly the best evidence of likelihood of confusion.") Simply, "[c]onvincing evidence of significant actual confusion occurring under actual marketplace conditions is the evidence of a likelihood of confusion." McCarthy § 23:13. The amount of post-sale reverse confusion complied here is unprecedented and establishes a likelihood of future confusion.

The eight factors considered in this Circuit as circumstantial evidence of a likelihood of confusion are "(1) the similarity of the marks; (2) the strength of the

plaintiff's mark; (3) the proximity or relatedness of the goods or services; (4) the defendant's intent in selecting the mark; (5) evidence of actual confusion; (6) the marketing channels used; (7) the likelihood of expansion into other markets; and (8) the degree of care likely to be exercised by purchasers of the defendant's product." *Fortune Dynamic, Inc. v. Victoria's Secret Stores Brand Mgmt., Inc*., 618 F.3d 1025, 1030 (9th Cir. 2010). This "eight-factor analysis is 'pliant,' illustrative rather than exhaustive, and best understood as simply providing helpful guideposts." *Id.*; *Dreamwerks*, 142 F.3d at 1129 ("The factors should not be rigidly weighed; we do not count beans."); *Eclipse Assoc. Ltd. v. Data Gen. Corp*., 894 F.2d 1114, 1118 (9th Cir.1990) ("These tests were not meant to be requirements or hoops that a district court need jump through to make the determination."). This eight-factor test is predicated on the assumption that "[w]hen the goods produced by the alleged infringer compete for sales with those of the trademark owner, infringement usually will be found if the marks are sufficiently similar that confusion can be expected. When the goods are related, but not competitive, several other factors are added to the calculus. If the goods are totally unrelated, there can be no infringement because confusion is unlikely." *Sleekcraft,* 599 F. 2d at 348. To the extent Dexcom focuses on the lack of relatedness, the existing customer confusion calls into question the third assumption. *Sleekcraft*, 599 F.2d at 352 ("Evidence that use of the two marks has already led to confusion is persuasive proof that future confusion is likely,")

### a)    <u>Similarity of the Marks</u>

Courts consider three principles in evaluating the similarities of the mark. "First, [s]imilarity is best adjudged by appearance, sound, and meaning . . . Second, the 'marks must be considered in their entirety and as they appear in the marketplace . . .Third, similarities are weighed more heavily than differences." *Ironhawk Techs.*, 2 F.4th at 1164 (simplified and additional quotations omitted). "Obviously, the greater the similarity between the two marks at issue, the greater the likelihood of confusion." *Id.*

14

Stelo's and Dexcom's use of "Stelo" is virtually identical in sight, sound, and meaning.  While Dexcom may reference the use of its house mark in connection with Stelo (*i.e.*, Stelo by Dexcom), "in a reverse confusion case the junior user's use of a house mark can also aggravate confusion by reinforcing the association between the mark and the junior user." *Ironhawk Techs.*, 2 F.4th at 1164 (citing *Americana Trading Inc. v. Russ Berrie & Co.*, 966 F.2d 1284 (9th Cir. 1992)).

This factor tips decidedly in Stelo's favor.

**b)    The Strength of the Mark**

In the reverse confusion context, the strength of the mark is judged from the perspective of the junior user. *Lodestar Anstalt v. Bacardi & Co. Limited*, 31 F.4th 1228 (9th Cir. 2022) ("the strength-of-the-mark factor in this reverse confusion case focuses on 'whether the junior mark is so commercially strong as to overtake the senior mark.'" (quoting *Ironhawk Techs.*, 2 F.4th at 1162 (simplified))). Additionally, "[i]n a prototypical reverse confusion case [like this], a senior user with a commercially weaker mark is pitted against a junior user with a far stronger mark. Accordingly, instead of considering the commercial strength of the junior's mark in isolation, we look to its relative strength as compared to that of the senior, 'because it is the strength of the larger, junior user's mark which results in reverse confusion.'" *Grubhub Inc. v. Relish Labs LLC*, 80 F.4th 835, 852 (7th Cir. 2023) (quoting *A & H Sportswear, Inc. v. Victoria's Secret Stores, Inc.*, 237 F.3d 198, 231 (3d Cir.2000)). So here, the Court "evaluate[s] the conceptual strength of [Stelo's] mark and compare it to the commercial strength" of Dexcom's use of that mark. *Ironhawk Techs.*, 2 F.4th at 1162.

"Where, as here, the Trademark Office issued a registration without requiring proof of secondary meaning, the federal registration provides prima facie evidence that the [Stelo] mark is inherently distinctive . . . ." *Ironhawk Techs.*, 2 F.4th at 1162.

The commercial strength of Dexcom's use of "Stelo" "is based on actual market recognition." *Good Meat Project v. GOOD Meat, Inc.*, 716 F.Supp.3d 783

15

(N.D. Cal. 2024) ("It is a fact-intensive inquiry that need not be reached at the preliminary injunction stage."). Commercial strength is signified by "extensive advertising, length of time in business, public recognition, and uniqueness." *Century 21 Real Est. Corp. v. Sandlin*, 846 F.2d 1175, 1179 (9th Cir. 1988). Although the Stelo Monitor has been on the market for less than a year, it has already garnered significant public recognition as evidenced by Google search results for "Stelo," the first 10 pages of which almost exclusively refer to the Stelo Monitor as well as public accolades for it being the first over-the-counter continuous glucose monitor marketed to persons with prediabetic conditions. Exs. 11 and 15. While Dexcom has not separately reported sales and marketing figures associated with its Stelo Monitor, Dexcom in 2024 had $4 billion in revenues and spent nearly $300 million on marketing and advertising. Ex. 3 at 224.

By contrast, Stelo rebranded from StarQuest less than three years ago, had revenues total $4 million in 2024 and spend 18% of revenues on advertising and marketing that year. Rampel Decl. ¶ 2.

Simply, "given the overwhelming commercial strength of" Dexcom's use of the "Stelo" name in comparison to Stelo's commercial strength, "this factor weighs in favor of a likelihood of confusion*." Lodestar Anstalt v. Bacardi & Co. Ltd.*, 31 F.4th 1228 (9th Cir. 2022) (the district court erred in finding this factor tipped against a likelihood of confusion).

### c)    <u>Relatedness of the Goods and Marketing Channels Used</u>

Dexcom will likely emphasize that its Stelo Monitor is in no way related to any of Stelo's enterprise software offerings and the goods are sold through different channels. Direct competition, however, is not a requirement. *Good Meat Project*, 716 F.Supp.3d at 800 ("The companies do not need to be direct competitors."). Instead, "[r]elated goods are those 'products which would be reasonably thought by the buying public to come from the same source if sold under the same mark.'"

*Sleekcraft*, 599 F.2d at 348 n. 10 (quoting *Standard Brands, Inc. v. Smidler*, 151 F.2d 34, 37 (2d Cir. 1945)). "To determine whether goods are related, courts may consider whether the goods are complementary, whether the products are sold to the same class of purchasers, and whether the goods are similar in use and function." *Groupion, LLC v. Groupon, Inc.*, 859 F. Supp. 2d 1067, 1074 (N.D. Cal. 2012). "[T]he relatedness of each company's prime directive isn't relevant. Rather, [the Court] must focus on [Dexcom's] customers and ask whether they are likely to associate [Stelo, a software company] with" the Stelo Monitor that leverages and promotes software as a competitive advantage. *Dreamwerks*, 142 F.3d at 1131. The stronger the mark, the larger shadow it casts across industries. *Tiger Lily*, 35 F.4th at 1363 (affirming Trademark Trial and Appeal Board finding of a likelihood of confusion between the use of Lehman Brothers for beer and spirits with the financial services company).

Stelo concedes that Dexcom's efforts to register "Stelo" in the same software class as the '605 Registration and the examiner's issuance an Office Action finding a likelihood of confusion are not determinative here on the issue of relatedness. *Carter-Wallace, Inc. v. Procter & Gamble Co.*, 434 F.2d 794, 802 (9th 1970) ("Any such determination made by the Patent Office under the circumstances just noted must be regarded as inconclusive since made at its lowest administrative level . . . ."). But it is not irrelevant, especially as to the issue of intent. *Theorem, Inc. v. Citrusbyte, LLC*, CV 21-4660-GW-AGRx, 2021 WL 5750238, *6 (C.D.Cal. Nov. 16, /2011) ("While Defendants attempt to argue away the import of their continued rebranding after the USPTO's initial notice, the Court finds that Defendants took a calculated risk that is ultimately proving costly.").

While Dexcom may believe that the relatedness factor tips decidedly in its favor, its own actually confused customers mitigate against such a finding. Some confused customers acknowledge that Stelo's software offerings are distinct from the Stelo Monitor but still maintain that the software company is affiliated with Dexcom

1  in some manner. Sheridan Decl. ¶ 8. Simply, in the reverse confusion context, where

2  the junior user's use of a mark casts a large shadow, the more rigid notions of

3  relatedness discussed in forward confusion cases should be relaxed. (*Ironhawk*, 2

4  F.4th at 1164 (finding error in the district court's conclusion that product was

5  unrelated since senior user sold exclusively to the government); *Dreamwerks*, 142

6  F.3d at 1131-32 (reversing grant of summary judgment, finding "that Dreamwerks

7  convention-goers might well assume that DreamWorks decided to ride the coattails

8  of Spielberg's unparalleled reputation for sci-fi/adventure films . . . into the sci-fi

9  merchandising business"); *Theorem, Inc*., WL 5750238, *7 (finding digital

10  marketing company and a custom software solutions company were sufficiently

11  related to warrant a preliminary injunction).

### d)    <u>Dexcom's Intent</u>

13        "In the reverse confusion context," such as here, the question to ask with

14  respect to intent is "whether there is some evidence that the junior user, when it knew

15  of the senior user, was at fault for not adequately respecting the rights of the senior

16  user." *Ironhawk*, 2 F.4th 1167-68 (quoting 4 McCarthy on Trademarks and Unfair

17  Competition § 23:10 (5th ed. 2020)). In the reverse confusion context, courts have

18  consistently found the junior user's disregard for the senior user's rights sufficient to

19  tip this factor in favor of the junior user. "This factor 'favors the plaintiff "where the

20  alleged infringer adopted his mark with knowledge, actual or constructive, that it was

21  another's trademark."'" *Id.* (quoting *JL Beverages Co., LLC v. Jim Beam Brands Co*.,

22  828 F. 3d 1098 at 1111– 12 (9th Cir. 2016) (quoting *Brookfield Commc'ns, Inc. v. W.

23  Coast Ent. Corp*., 174 F.3d 1036, 1059 (9th Cir. 1999))). "Intent can be shown

24  through evidence that the junior user deliberately intended to push the senior out of

25  the market by flooding the market with advertising to create reverse confusion, or

26  'by evidence that, for example, the [junior] knew of the mark, should have known of

27  the mark, intended to copy the [senior], failed to conduct a reasonably adequate

28  trademark search, or otherwise culpably disregarded the risk of reverse confusion.'"

1  *Id.* (quoting *Marketquest Grp., Inc. v. BIC Corp.*, 862 F.3d 927, 934–35 (9th Cir.
2  2017).

3      Here, there is no question that Dexcom knew of Stelo's rights. It not only
4  received an Office Action identifying a likelihood of confusion, but Stelo itself
5  notified Dexcom of the substantial reverse confusion resulting from the launch of the
6  Stelo Monitor along with Dexcom's aggressive marketing thereof. Gatling Decl. ¶¶
7  6-9.  Moreover, Dexcom's own confused customers suggest Dexcom itself fueled the
8  confusion by providing its customers with Stelo's support number.  Sheridan Decl. ¶
9  8.  While Dexcom may argue against consideration being given to the Office Action,
10  "it took a calculated risk that is ultimately proving costly." *Theorem, Inc.*, WL
11  5750238, *8 ("Even if the Court accepts Defendants' assertions that it did not act in
12  bad faith, Defendants willingly took the reckless step of continuing their rebranding
13  in the face of the aforementioned issues/problems.").

14      The intent factor tips decidedly in Stelo's favor.

15          **e)**    **Actual Confusion**

16      The three thousand instances of actual confusion received by Stelo over the
17  last 11 months are unprecedented in trademark jurisprudence and, as discussed
18  above, alone warrant the grant of a preliminary injunction.  While the confusion at
19  issue may not be at the point of sale, the Ninth Circuit previously reversed a grant of
20  summary judgment, where a district court failed to give due consideration to actual
21  post-sale confusion evidence.  *Stone Creek,* 875 F.3d at 431.

22      Dexcom in opposition can be expected to go all in to diminish this evidence.
23  The confusion here, however, cannot be classified as *de minimis* misdirected
24  inquiries or deliveries. *Checkpoint Sys., Inc. v. Check Point Software Techs., Inc.*,
25  269 F.3d 270, 297-98 (3rd 2001) ("[T]his confusion consisted of misdirected calls
26  and therefore it is uncertain whether the consumers were confused by the parties'
27  similar names or whether directory assistance erred in connecting consumers with
28  the parties."); *Credit One Corp. v. Credit One Fin., Inc.*, 661 F.Supp.2d 1134, 1139

19

(C.D. Cal. 2009) ("Plaintiff's proffered evidence of telephone calls and Western Union payments apparently intended for Defendants are more properly characterized as 'misdirected communications' than evidence of actual confusion."); *Delta Forensic Engineering, Inc. v. Delta V Biomechanics, Inc*., 402 F.Supp.3d 902, 910 (C.D. Cal. 2019) ("[T]he Federal Express package and the purported misdirected checks are no more than misdirected communications unrelated to actual confusion."). Moreover, the actual confusion here is indisputable confusion among Dexcom's actual customers, and not that of competitors, vendors, or the general public, even though such evidence can be relevant as well. *Theorem*, 2021 WL 5750238, *9 (finding "that the actual confusion by sophisticated entities that were working with or for Plaintiff could serve as a proxy for consumer confusion because the entities were sophisticated but still exhibited confusion between the two marks.").

Stelo also agrees that time and a denominator – the number of potential instances of confusion – can militate against the probative value of actual confusion evidence. *Lerner & Rowe PC v. Brown Engstrand & Shely LLC*, 119 F.4th 711 (9th Cir. 2024) (finding 236 calls between 2017-2021 "constitute[d] only 0.216% of the total number of users exposed to the challenged advertisements.")   No court, however, has confronted this level of confusion in a similar time frame, and Stelo has no insight into the number of Stelo Monitors sold during this time frame.

The intent to confuse factor tips decidedly in Stelo's favor.

### f)   Likelihood of Expansion

It is well-recognized that "reverse confusion can foreclose the senior user from expanding into related fields" and is a harm that the doctrine seeks to avoid. *Ironhawk*, 2 F.4th 1160. Here, Stelo has a stated intent to expand its enterprise business into the consumer marketplace by developing applications for smartphones that allow interoperability with its existing software solutions.  Rampel Decl. ¶ 4. Additionally, Stelo is a software solution company that integrates data across platforms.  *Id.*  As medical monitoring systems leave the lab and doctor's offices and

20

1    are available directly to consumers, it is logical that the medical device community
2    will need to integrate various sensors collecting data with devices that make the data
3    readily accessible to consumers like by smartphone. Absent an injunction, any
4    medical device company seeking a partner to help facilitate this integration will likely
5    confuse Stelo with the Stelo Monitor and Dexcom, making Stelo beholden to
6    Dexcom's reputation.

7         The likely expansion factor tips in Stelo's favor.

8              **g)    The Consumer's Degree of Care**

9         Stelo agrees that its customers are sophisticated, and its existing customers are
10   not likely to confuse the Stelo Monitor with its enterprise software. But the confusion
11   here is not forward but reverse.  As Dexcom captures more and more of the air around
12   the Stelo name, it would not be unreasonable for potential Stelo consumers to
13   perceive Stelo, a software company, as simply a division of Dexcom, which sells the
14   Stelo Monitor, touting the software integration of its sensors with its smartphone
15   application. Such a loss of independence effectively constitutes reverse initial interest
16   confusion. Simply, a search for Stelo on the internet brings up a plethora of references
17   to the Stelo Monitor that likely will bias a potential customer depending on their
18   opinion of Dexcom or an affiliation of a software company with an over-the-counter
19   consumer glucose monitor.  Ex. 15.  The overwhelming association of "Stelo" with
20   the Stelo Monitor has the effect of a reverse dilution, diluting any independent
21   identification of "Stelo" with the enterprise software company, which is a harm the
22   Lanham Act should protect against.

23        **C.    Irreparable Harm**

24         "By statute, [Stelo] is entitled to a rebuttable presumption of irreparable harm
25   on its trademark claim" since it has demonstrated a likelihood of success on the merits
26   either through its direct evidence of overwhelming actual confusion or because the
27   weight of the *Sleekcraft* circumstantial factors tip decidedly in its favor. *AK Futures*,
28   35 F.4th at 688 (citing 15 U.S.C. § 1116(a)). This presumption "is a heavy one in

21

view of the reality that monetary compensation for trademark infringement is, in the language of equity, inherently 'inadequate' and injury is fundamentally 'irreparable.'" McCarthy 30:47; *AK Futures*, F.4th at 694 (it is insufficient for a defendant to merely stop selling products under the infringing mark).

Even if this Court were to find that Stelo is not entitled to a presumption of irreparable harm because it has shown only serious questions going to the merits, overwhelming evidence exists that Stelo will be irreparably harmed by Dexcom's continued use of "Stelo" in connection with its monitor. *San Diego Comic Convention v. Dan Farr Prods.*, 336 F.Supp.3d 1191, 1197 (S.D. Cal. 2018) (evidence of significant actual confusion warrants a finding of irreparable harm); *Gianni Versace, S.p.A., v. Versace 19.69 Abbigliamento Sportivo SRL*, 328 F.Supp.3d 1007, 1032 (N.D. Cal. 2018) (same). While Stelo has no evidence that it has lost any sales to Dexcom because of the latter's use of the Stelo name, the overwhelming amount of actual consumer confusion has buried support requests directed to Stelo resulting in response delay. Sheridan Decl. ¶ 15. Moreover, the loss of "Stelo's" association with Stelo is a well-recognized harm to the goodwill and reputation of a rights holder that is irreparable, warranting a preliminary injunction even if Stelo were only able to demonstrate serious questions going to the merits of its claim. Without an injunction, Stelo will have no choice but to change its name for the second time in five years, which will likely further damage its goodwill and reputation in a manner that money cannot compensate. Rampel Decl. ¶ 21. While it may be true that money can compensate Stelo for the cost of any rebranding, the true harm from rebranding is reputational and not simply the costs associated with identity and implementing a new name.

Dexcom will undoubtedly argue that the 11 months that have passed since it launched the Stelo Monitor militates against any irreparable harm. *Oakland Tribune, Inc. v. Chronicle Pub. Co.*, 762 F.2d 1374, 1377 (9th Cir. 1985) ("[L]ong delay before seeking a preliminary injunction implies a lack of urgency and irreparable harm.").

STARQUEST'S MEMO. OF P&AS IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION

1    "[D]elay[, however,] is but a single factor to consider in evaluating irreparable

2    injury" and that "courts are 'loath to withhold relief solely on that ground.'" *Arc of*

3    *Cal. v. Douglas*, 757 F.3d 975, 990 (9th Cir. 2014) (quoting *Lydo Enters., Inc. v. City*

4    *of Las Vegas*, 745 F.2d 1211, 1214 (9th Cir. 1984)).

5         Stelo has not been sitting on its rights.  Stelo, through counsel, promptly

6    reached out to Dexcom's counsel and began discussing whether a coexistence

7    agreement would be possible. Gatling Decl. ¶ 7.  Thereafter, and as the instances of

8    actual confusion did not subside, Stelo sought an informal resolution to the ongoing

9    actual confusion, but to no avail. *Id.* at ¶¶ 8-10; *Arc of Cal.*, 757 F.3d at 990 (where

10   there are "ongoing, worsening injuries," delay is not terribly probative).  Simply, no

11   court has found a delay of this sort sufficient to overcome a presumption of

12   irreparable harm, let alone the evidence of actual harm that Stelo has presented.

13   *Compare Kiva Health*, 402 F.Supp.3d at 897 (where the plaintiff knew of infringing

14   use in 2015 and sent its first cease in desist in 2018).

15         **D.    Balance of Equities**

16         "Courts must balance the competing claims of injury and must consider the

17   effect on each party of the granting or withholding of the requested relief." *Winter v.*

18   *Natural Resources Defense Council, Inc.*, 555 U.S. 7, 24 (2008). In response to

19   Stelo's irreparable harm, Dexcom can be expected to argue that it will suffer a greater

20   detriment due to its larger size. Detriment that is the product of an infringer's conduct,

21   however, is not the type of harm relevant to the balance of equities. *2Die4Kourt v.*

22   *Hillair Capital Mgmt.*, 692 F. App'x 366, 369 (9th Cir. 2017) ("[W]hen the harm

23   complained of results from a defendant's allegedly infringing conduct, we have

24   nonetheless approved the entry of a preliminary injunction."); *Cadence Design Sys.*

25   *v. Avant! Corp.*, 125 F.3d 824, 829 (9th Cir. 1997) (stating defendant who knowingly

26   infringes another's copyright "cannot complain" when properly required to cease

27   infringing activities). Simply, "Ninth Circuit precedent holds that defendants cannot

28   complain of alleged harms to its business 'when properly forced to desist from [their]

23

infringing activities.'" *Lashify, Inc. v. Urban Dollz LLC,* CV 22-6148-GW-AFMx, 2022 WL 18281527, *12 (C.D. Cal. Dec. 14, 2022) (quoting *Triad Sys. Corp. v. Se. Express Co*., 64 F.3d 1330, 1338 (9th Cir. 1995). Additionally, Stelo's proposal that Dexcom be given a 90-day grace period to comply with any preliminary injunction would mitigate any initial harm claimed by Dexcom.

Thus, the balance of equities tip in Stelo's favor.

### E.    Public Interest

"The public interest analysis for the issuance of a preliminary injunction requires [the Court] to consider whether there exists some critical public interest that would be injured by the grant of preliminary relief." *Alliance for the Wild Rockies*, 632 F.3d at 1138 (citation omitted). "Trademarks protect the public from confusion by accurately indicating the source of a product." *State of Idaho Potato Comm'n v. G & T Terminal Packaging, Inc*., 425 F.3d 708, 715 (9th Cir. 2005).  Additionally, this public interest is heightened when the confusion at issue relates to a medical device. *McLeod*, 1976 WL 21104. "Here, given the strong public policy in favor of mitigating customer confusion coupled with Plaintiff's strong showing of a likelihood of success on the merits, the . . . the public interest supports issuance of a preliminary injunction." *Las Vegas Sands Corp. v. Fan Yu Ming*, 360 F.Supp.3d 1072, 1081 (D. Nev. 2019).

### F.    Bond

Under Rule 65(c), "[t]he court may issue a preliminary injunction . . . only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. Proc. 65(c). Despite the seemingly mandatory language, "Rule 65(c) invests the court with discretion as to the amount of security required, if any." *Jorgensen v. Cassiday*, 320 F.3d 906, 919 (9th Cir. 2003) (quoting *Barahona–Gomez v. Reno*, 167 F.3d 1228, 1237 (9th Cir. 1999)). Additionally, "the language of Rule 65(c) does not absolve the party affected by the injunction from its obligation

24

of presenting evidence that a bond is needed." *Conn. Gen. Life Ins. Co. v. New Images of Beverly Hills*, 321 F.3d 878, 883 (9th Cir. 2003).

A likelihood of success on the merits warrants a more nominal bond in line with a senior user's ability to pay irrespective of the claims of injury to a much larger junior user. *GoTo.com, Inc. v. Walt Disney Co*., 202 F.3d 1199, 1211 (9th Cir. 2000) (upheld trial court's rejection of defendant Disney's request to increase bond from $25,000 to $20 million); *2Die4Kourt*, 692 F. App'. at 369 ("[T]he likelihood of success on the merits, as found by the district court, tips in favor of a minimal bond or no bond at all.")

Stelo suggests a bond of not more than $50,000.

## IV.    CONCLUSION

For the foregoing reasons, Stelo requests that the Court grant its motion and preliminarily enjoin Dexcom's continued use of the "Stelo" mark.

Dated:        June 30, 2025                                FOX ROTHSCHILD LLP


                                                          */s/ John J. Shaeffer*
                                                          John J. Shaeffer
                                                          Meeghan H. Tirtasaputra
                                                          Attorneys for Plaintiff StarQuest
                                                          Ventures, Inc.

STARQUEST'S MEMO. OF P&AS IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION